Upon review of all of the competent evidence of record with reference to the errors assigned, and finding good grounds to reconsider the evidence, the Full Commission REVERSES the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award:
Based upon the competent evidence adduced at the hearing, the Full Commission makes the following
FINDINGS OF FACT
1. Plaintiff is a 50 year old married female with a computer degree from Hardbargers Business College.
2. At the time in question on Saturday, June 8, 1991 the Plaintiff was riding as a passenger on the back of her husband's 1988 Honda motorcycle. As Plaintiff's husband turned off Highway 50 onto Little Kinston Road in Pender County, he ran into a layer of accumulated sand on the road causing the motorcycle to slip and fall over on top of the Plaintiff's leg. Plaintiff sustained a right ankle fracture. Plaintiff's husband was operating his motorcycle at a speed of approximately five miles per hour at the time he entered the turn and encountered the sand on the roadway. Approximately one to one and a half inches of sand covered the plaintiff's lane of travel. Plaintiff's husband did not have time to take evasive action to avoid the sand.
3. Police officer Paul Edward Cheshire of the Surf City Police Department investigated the accident and reported that he determined that the motorcycle was going approximately five miles an hour when the accident occurred and that it fell because it "had slipped in the sand." He further testified that between an inch and an inch and a half of sand was on the roadway at the place where the accident occurred and that in his opinion the wind could not have put that amount of sand or dirt on the roadway in a two day period of time. Officer Cheshire also testified that the fire department used shovels to remove the sand and dirt from the roadway after the accident.
4. Mrs. Evelyn Raynor, a disinterested party, lived at the intersection where the accident occurred and testified by deposition. She testified that the State Department of Transportation workers had been working on the place where the accident occurred both the day before the accident and also earlier in the week and that "they had completed the paving and the sand — they had taken sand to level off around the edge of the pavement." In response to plaintiff's attorney's questioning about the condition of the road at the spot where the accident occurred, Mrs. Raynor testified as follows:
 "The area of the turn lane that they had just added was pretty well covered. It did not have humps of sand on it, but it was pretty well covered all the way around to the curve where it's marked there. Around the curve, there was a sheet of sand; there was." [Raynor Deposition, p. 9.]
She observed that the sand was left after the Department of Transportation left and it had not changed to any noticeable degree on the morning of the accident.
5. Andy Bryan Davis, a heavy equipment operator for the North Carolina Department of Transportation, testified that immediately after the new turn lanes were paved and just prior to the day of the accident, the Department of Transportation workers had been doing shoulder work — i.e., building up the shoulder of the road to be as high as the new pavement, and that they had been working at the intersection where the accident occurred, bringing in dirt, dumping it in piles at the edge of the new pavement, pushing it onto the shoulder with a grader, and sweeping the excess dirt off the pavement whenever necessary. Both Bryan Davis and Mark D. Cole, another DOT employee testified that they did not leave any sand or dirt on the highway.
6. In April of that same year, Highway 50 had been widened at its intersection with Little Kinston Road, to add turning lanes in both directions as well as merging lanes. The grading work was done in April, but the paving and shoulder work was not done until two months later in June. As part of the paving process, an eighteen inch roadbed had to be cut out of the existing terrain, which was made up of a dirt and sand mixture. The soil that was cut out for the roadbed was taken to a stockpile for storage until it could be used again to build the shoulder back up when the paving was completed according to Department of Transportation policy requiring that the same local materials be used under these circumstances.
7. Beginning on Wednesday, June 5, 1991, Department of Transportation maintenance crews returned to the same area after the paving was completed to build up and dress the shoulder, first using the same local material that had been cut out to make the underlying roadbed and subsequently stockpiled, and then finishing it off with sand. The local material was brought from the stockpile and dumped in piles along the edge of the new lanes that had been paved at the intersection of Highway 50 and Little Kinston Road. In addition, sand was brought in for this project. From there a motor-grader was used to push the piles of local material and sand that dump trucks had dumped in the edge of the roadway off the roadway onto the shoulder, building it up according to Department of Transportation specifications, and then the tires of the vehicles were used to pack it down.
8. The maintenance crew leader, E.M. Powell, Jr., testified that once the motor-grader had pushed the piles of dirt and sand onto the shoulder and the shoulder was built up and dressed, a broom truck, which had a water tank designed to water down the same material and prevent it from blowing back onto the road, was used to sweep off any excess soil and sand that remained on the road. After the road was swept, Mr. Powell testified that he did a slide test to insure that the area was safe by driving through in his truck at approximately 35 miles an hour and tapping the brakes to determine whether the vehicle would slide. Based upon Mr. Powell's testimony which appeared to be a recitation of his routine practices rather than the specifics of what happened in this case, his lack of recollection of the results of the alleged slide tests, and other evidence presented, the Full Commission does not accept Mr. Powell's testimony that he conducted a slide test at the completion of the project as credible. Mr. Powell testified by deposition and the Full Commission is in the same position as the Deputy Commissioner in assessing the credibility of Mr. Powell.
9. Billy B. Dixon, a county maintenance supervisor who supervised E.M. Powell, Jr., testified that although he routinely visited highway projects upon their completion to inspect both their satisfactory completion as well as the fact that they were left in a safe condition for the using public, he did not follow up this particular project with such an inspection visit. He also testified that while it was routine practice to conduct a "slide test" at the end of each day and the end of the project, he could not recall the results of such tests in this instance.
10. The Department of Transportation maintenance crew which was supervised by E.M. Powell, Jr., and Billy B. Dixon left an accumulation of sand and dirt on the roadway at the completion of the road work on or about June 6 or June 7, 1991. The Department of Transportation maintenance crew had a duty to take reasonable measures to clear the roadway of loose sand and dirt at the completion of its roadwork. It was reasonably foreseeable that an accumulation of one to one and a half inches of sand and dirt on the traveled portion of the highway would create a hazard for motorists.
11. The testimony of Department of Transportation workers, who were interested witnesses, that no sand or dirt was left on the roadway is not accepted as credible. More weight and credibility is accorded to the testimony of Mrs. Raynor, the disinterested witness that the sand was left by the Department of Transportation maintenance crew at the completion of the work and that she saw the sand on the roadway after they left and on the morning of plaintiff's accident. The Full Commission is in the same position as the Deputy Commissioner in assessing the credibility of Mrs. Raynor as she testified by deposition.
12. Even if the sand or dirt blew off of the shoulders onto the surface of the road, the Department of Transportation maintenance crew was not only responsible for insuring that any soil or sand had been removed from the roadway after it completed its shoulder work, it was also responsible for taking reasonable measures to insure that the shoulders remained stable and in place.
13. The failure of E.M. Powell, Jr., and Billy B. Dixon to insure that the maintenance crew they supervised cleared the roadway of accumulations of sand and dirt at the completion of their road work constituted actionable negligence on their part. Plaintiff was injured and suffered damages as a result of the negligence of said State employees.
14. The Commission finds that there was no contributory negligence on the part of plaintiff or her husband, the driver of the motorcycle.
15. As a result of plaintiff's accident resulting from the defendant's negligence, plaintiff suffered injury to her right ankle which required surgery and which resulted in a permanent 10 percent impairment of her lower extremity as well as reflex sympathetic dystrophy (RSD). Her injury and its treatment required her to be out of work from June 10, 1991 through November 13, 1991; from June 1, 1992 through August 10, 1992 (50 days); and from December 14, 1992 through March 1, 1993 (3 months).
16. Plaintiff incurred medical bills totaling $29,619.58 (stipulated); incurred prescription costs of $61.89 (stipulated); lost $18,960.00 in wages (wage record stipulated); incurred $778.44 in travel expenses (stipulated); suffered a ten percent permanent impairment of the right lower extremity; and suffered pain and suffering from the injury and from its resulting reflex sympathetic dystrophy which Dr. Fajgenbaum testified was usually so severe that it is much greater than what one would experience from the fracture or the surgery and that it is more limiting than even the fracture.
17. Plaintiff has been damaged in the amount of $100,000.00 as a result of the negligence of the defendant.
**************
Based on the foregoing findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. At the time complained of, there was actionable negligence on the part of E.M. Powell, Jr., an agent or representative of the North Carolina Department of Transportation, and the maintenance crew leader of the highway improvement project, and his supervisor, Billy B. Dixon, also an agent or representative of the North Carolina Department of Transportation, and a county maintenance supervisor, while both were acting within the scope of their employment, proximately resulting in the injury and damages to plaintiff that are subject of the instant personal injury claim under the Tort Claims Act. Phillips v. N.C.Department of Transportation, 80 N.C. App. 135, 341 S.E.2d 339
(1986). N.C. Gen. Stat. § 141-291(a).
2. Neither the plaintiff nor the plaintiff's husband, the driver of the motorcycle on which the plaintiff was riding when the accident of record occurred, were contributorily negligent in the occurrence of the accident and injury resulting from the defendant's negligence. N.C. Gen. Stat. § 141-291(a).
3. As a result of the defendant's negligence, plaintiff suffered permanent injury which resulted in surgery and reflex sympathetic dystrophy, pain and suffering, a 10 percent permanent disability to her right lower extremity, lost wages and other expenses for which the plaintiff is entitled to an award of damages from the defendant. N.C. Gen. Stat. § 141-291(a).
**************
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
ORDER
1. The Defendant shall pay to Plaintiff damages in the amount of $100,000.00.
2. Defendants shall bear the costs of this proceeding.
 S/ ____________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ ____________ THOMAS J. BOLCH COMMISSIONER
S/ ____________ COY M. VANCE COMMISSIONER